Filed 12/24/07

# IN THE SUPREME COURT OF CALIFORNIA

HEBREW ACADEMY )
OF SAN FRANCISCO et al., )
)
  Plaintiffs and Appellants, )
)     S134873
  v. )
)    Ct.App. 1/2 A106618
RICHARD N. GOLDMAN et al., )
)   Superior Court of the
)  City and County of San Francisco
  Defendants and Respondents. )     No. 414796
_____ )

   In this case, we address whether the statute of limitations bars a cause of action for defamation that is based upon statements contained in a transcript of an oral history that was published with only limited circulation. We held in *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1237, that under the single-publication rule, the statute of limitations on a cause of action for defamation based upon a statement in a book published with general circulation "ran from the date the book was first generally distributed to the public, regardless of the date on which plaintiff actually learned of the existence of the book and read its contents." We further held "that the discovery rule does not apply to delay the accrual of a cause of action for a defamation contained in such a publication." (*Ibid*.) We expressly did not address, however, "[t]he applicability of the single-publication rule to written publications that receive an extremely limited distribution . . . ." (*Id.* at p. 1245, fn. 6.)

As explained below, we conclude that our holding in *Shively v. Bozanich*, *supra*, 31 Cal.4th 1230 applies as well to publications that are not widely distributed.

## FACTS

On November 18, 2002, the Hebrew Academy of San Francisco and its founder and dean, Rabbi Pinchas Lipner, sued Richard N. Goldman, the Jewish Community Federation of San Francisco, the Peninsula, Marin and Sonoma Counties (Federation), and related defendants for defamation and placing plaintiffs in a false light.[1]  In a second amended complaint, plaintiffs alleged that they had been defamed a decade earlier "in the early 1990's" during an interview of Goldman conducted by Eleanor Glaser as part of the Jewish Community Federation Oral History Project, in which Goldman stated, inter alia, that Rabbi Lipner "doesn't deserve respect for the way he conducts his affairs," is not "an honorable man," "has done little for the community," is "self-serving and an embarrassment," and was "run out of other communities before he got here," adding:  "I'm not sure but I think he had been in Cleveland before he came here.  Somebody checked the record and found that community did not tolerate him."  Goldman also recounted that on "a couple of occasions" at the Hebrew Academy, "[w]hen he would walk into the room, the children would stand at attention as if it were the Fuhrer walking in."

Plaintiffs alleged that this oral history project was conducted "under the auspices" of the Regional Oral History Office of the Bancroft Library at the University of California, Berkeley.  The project consisted of a series of interviews

---

[1]     The record before us does not include a copy of the original complaint, but the Court of Appeal's opinion so states and neither party filed a petition for rehearing challenging these facts.

of Federation presidents and executives.  Fewer than 10 copies of the transcripts of these interviews were published.  Plaintiffs alleged that Rabbi Lipner first became aware of these statements on or about the first week of January 2002, when he "was informed by a researcher" that the Regional Oral History Office of the Bancroft Library "had published a transcript of the Goldman interview."

Defendants filed a motion for summary judgment on the ground, among others, that the action was barred by the one-year statute of limitations set forth in Code of Civil Procedure section 340, former subdivision (3) (redesignated subd. (c) by Stats. 2002, ch. 448, § 1).  Defendants submitted in support of the motion the declaration of Shannon Page, the assistant director of the Regional Oral History Office of the Bancroft Library (ROHO).  Page declared that ROHO is a division of the Bancroft Library at the University of California, Berkeley, which "is the primary special collections library at the University of California, and is one of the largest and most heavily used libraries of its kind in the United States. . . . [I]ts holdings include more than half a million volumes and 50,000,000 manuscript items. . . . [¶] Bancroft's collection is listed in several publicly available online catalogs . . . . These online resources are supplemented by card catalogs, finding aids, and a reference collection housed in Bancroft's Heller Reading Room."

Page further declared: "ROHO researcher Eleanor K. Glaser conducted the Goldman interview at issue in this action as one in a series of interviews begun in 1990 to record the contemporary history of the Jewish Welfare Federation ('JWF').  The series, sponsored by the Jewish Community Endowment Fund, sought to collect the oral histories of the then thirteen living past presidents of the Jewish Community Federation of San Francisco . . . . [¶]The Goldman interview itself was conducted in 1992, copyrighted for publication, and published in 1993. . . . [¶] The Goldman interview, like all ROHO transcripts, was placed in the

Bancroft Library at Berkeley and in the Charles E. Young Research Library at UCLA, and copies were made available at cost to other libraries. . . . [¶] . . . In addition . . . the Goldman interview . . . has been acquired, for example, by the New York Public Library, as well as private entitles, including the Jewish Community Federation Library and Temple Emanu-El in San Francisco."

In opposition to the motion for summary judgment, Rabbi Lipner declared that "[o]n or about December 28, 2001, a researcher, Miriam Real, provided me with a copies [*sic*] of two pages from a transcript of an interview of Richard N. Goldman containing the defamatory statement about me and the Hebrew Academy that are the basis for this lawsuit. Prior to that time, I did not know, and could not with reasonable diligence have known, that defendants had published such statements, in that the transcripts were never distributed to the general public, but were available only in a few locations."

Miriam Real declared that she was the director of admissions for the Hebrew Academy and formerly had been "employed as an interviewer and editor at the Regional Oral History Office, University of California, Berkeley, the same position held by Eleanor Glaser." Real decided to write a book about Rabbi Lipner and, while conducting preliminary research, learned about the series of interviews with past presidents of the Federation. Real stated: "Although transcripts of the [ROHO] interviews were kept at the Bancroft Library on the University of California campus, the transcripts themselves were not readily available for viewing by the public. The transcripts were kept in the stacks, to which the general public does not have access. After searching the card catalog for potentially useful transcripts, I then required that the transcripts be retrieved from the stacks. . . . If I found a reference to a potentially useful subject, I then filled out a form to request that the referenced pages of the transcript be copied and, rather than waiting several hours for the copies, requested that the pages be

4

mailed to me.  I was not allowed to make copies of the pages myself. [¶] . . .
Toward the end of winter break in December 2001, I reviewed the materials I had
accumulated . . . . On or about Friday, December 28, 2001, I first discovered
Richard Goldman's defamatory statements.  I promptly contacted Rabbi Lipner
and faxed the two pages containing the statements to him."

The superior court granted defendants' motion for summary judgment,
ruling that the action was "barred by the one-year statute of limitations set forth in
California Code of Civil Procedure section 340[, subd. (c)]."  The court further
held that "the 'rule of discovery' asserted by plaintiffs in an attempt to toll the
statute of limitations does not apply in this action."  The Court of Appeal reversed,
ruling that the alleged defamation was not subject to the single-publication rule,
and that the action was tolled by the discovery rule "because the alleged libel was
hidden or beyond what the ordinary person could be expected to immediately
detect or comprehend."  One justice dissented on the grounds that "the unique
facts of this case place it within the single-publication rule and, separate and apart
from that, also beyond the reach of the delayed-discovery rule."

### DISCUSSION

As we recently explained in *Shively v. Bozanich*, *supra*, 31 Cal.4th 1230,
1245, the single-publication rule provides "that, for any single edition of a
newspaper or book, there [is] but a single potential action for a defamatory
statement contained in the newspaper or book, no matter how many copies of the
newspaper or the book were distributed. [Citations.]"  We further held in *Shively*
that the accrual of the cause of action in that case was not delayed by the discovery
rule—which provides "that in some instances, the accrual of a cause of action in
tort is delayed until the plaintiff discovered (or reasonably should have discovered
or suspected) the factual basis for his or her claim" (*id.* at p. 1248)—because the
justification for the discovery rule "does not apply when the defamation occurred

5

by means of a book, magazine, or newspaper that was distributed to the public."
(*Id.* at pp. 1250-1251.)

As explained below, we hold that the single-publication rule applies not
only to books and newspapers that are published with general circulation (as we
addressed in *Shively*), but also to publications like that in the present case that are
given only limited circulation and, thus, are not generally distributed to the public.
Further, the discovery rule, which we held in *Shively* does not apply when a book
or newspaper is generally distributed to the public, does not apply even when, as
in the present case, a publication is given only limited distribution.

The plaintiff in *Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1238, alleged
that she had been defamed by being described as " 'a felony probationer' " in the
book, A Problem of Evidence.  The book was on sale in California no later than
September 18, 1996 and by October 21, 1996, almost 7,000 copies of the book
had been shipped to California and 33,000 copies had been distributed throughout
the country.  The plaintiff alleged that she first became aware of the allegedly
defamatory statement when she purchased and read the book in December 1996.
She filed an action for defamation on October 22, 1997, 10 months after she
allegedly became aware of the defamation, but just more than a year after the book
had been distributed to the public.  We held that her defamation cause of action
was barred by the one-year statute of limitations, because "in defamation actions
the general rule is that publication occurs when the defendant communicates the
defamatory statement to a person other than the person being defamed. [Citations.]
. . . [W]ith respect to books and newspapers, publication occurs (and the cause of
action accrues) when the book or newspaper is first generally distributed to the
public. [Citations.]"  (*Id.* at p. 1247.)

Our holding in *Shively* that a cause of action for defamation based upon a
statement in a book or newspaper accrues when the book or newspaper is first

6

generally distributed to the public is an application of the single-publication rule, which establishes an exception to the general "rule that each publication of a defamatory statement gives rise to a new cause of action for defamation." (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1243.)  Under the general rule, a new cause of action for defamation arises each time the defamer "repeats or recirculates his or her original remarks to a new audience. [Citations.]" (*Ibid.*; Newell, Libel and Slander (2d. ed. 1898) Publication of Defamatory Matter, § 23, p. 243 ["Every sale or delivery of a written or printed copy of a libel is a fresh publication . . . ."].)

     This venerable common law rule came into question with the advent of mass publication of books and newspapers.[2]  As we explained in *Shively*:  "Under the common law as it existed in the 19th century and early part of the 20th century, the principle that each communication of a defamatory remark to a new audience constitutes a separate 'publication,' giving rise to a separate cause of action, led to the conclusion that each sale or delivery of a copy of a newspaper or book containing a defamation also constitutes a separate publication of the defamation to a new audience, giving rise to a separate cause of action for defamation. [Citations.] This conclusion had the potential to subject the publishers of books and newspapers to lawsuits stating hundreds, thousands, or even millions of causes of action for a single issue of a periodical or edition of a book.  This conclusion also had the potential to disturb the repose that the statute of limitations

---

[2]    As one commentator stated:  "Commencing with an 1849 decision the English Courts ruled that every sale or delivery of each single copy of a newspaper or magazine is a separate publication and a separate tort, and this rule was accepted in the United States.  Regardless of whether it was an appropriate rule in 1849 it is horrendous today when magazine readers and radio and TV audiences may total many millions."  (Eldredge, The Law of Defamation (1978) § 38, p. 209, fns. omitted.)

ordinarily would afford, because a new publication of the defamation could occur if a copy of the newspaper or book were preserved for many years and then came into the hands of a new reader who had not discovered it previously. The statute of limitations could be tolled indefinitely, perhaps forever, under this approach." (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1243-1244.) Thus, applying to books and newspapers the general rule that each re-publication of a defamation gives rise to a new cause of action would trigger two separate but related concerns: there could be a multiplicity of actions and the statute of limitations would begin to run anew upon each re-publication.

The single-publication rule directly addresses the first of these concerns— the potential for a multiplicity of suits—by "holding that, for any single edition of a newspaper or book, there [is] but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or the book were distributed." (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1245.) This rule was codified in California by the adoption in 1955 of the Uniform Single Publication Act. (Civ. Code, § 3425.1, et seq.) Civil Code section 3425.3 states: "No person shall have more than one cause of action for damages for libel or slander . . . founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine . . . ."

We recognized in *Shively* that the single-publication rule also indirectly addresses the second concern that would be raised by applying to publications the general rule that a new cause of action for defamation arises upon each re-publication—that the statute of limitations would begin to run anew upon each re-publication—by observing that "[u]nder the single-publication rule, with respect to the statute of limitations, publication generally is said to occur on the 'first general distribution of the publication to the public.' [Citations.]" (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1245.) Thus, the single-publication rule

directly prevents a multiplicity of suits by declaring that there can be only one cause of action for defamation based upon a single publication, and indirectly limits the extension of the statute of limitations through the judicial interpretation that this single cause of action accrues upon the first general distribution of the work to the public.  (See *Bradford v. American Media Operations, Inc.* (E.D.Pa. 1995) 882 F.Supp. 1508, 1514 ["On its face, the Uniform Single Publication Act only limits the number of suits a plaintiff may bring on a single publication of defamatory material; it is silent as to when the statute of limitations begins to accrue on a defamation or invasion of privacy claim.  Nevertheless, . . . a number of jurisdictions have interpreted the single publication rule as establishing that the statute of limitations begins to run on the date a publication generally becomes available to the public for purchase." (Fn. omitted.)]; Note, *The Single Publication Rule in Libel: A Fiction Misapplied* (1949) 62 Harv. L.Rev. 1041, 1041-1042.)

The single-publication rule as described in our opinion in *Shively* and as codified in Civil Code section 3425.3 applies without limitation to all publications. Civil Code section 3425.3 applies to tort claims "founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine . . . ."  Thus, the single-publication rule applies in the present case, even though the transcript of the oral history at issue was published with only limited circulation.

Having concluded that the single-publication rule applies to all publications, including those that receive only limited circulation, we consider whether the accrual of the cause of action for defamation in this case was delayed by the discovery rule.  As noted above, we stated in *Shively* that "[u]nder the single-publication rule, with respect to the statute of limitations, publication

generally is said to occur on the 'first general distribution of the publication to the public.' [Citations.]"  (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1245.)[3]  But we also considered in *Shively* whether the discovery rule postponed the accrual of the cause of action and, thus, delayed the running of the one-year statute of limitations set forth in Code of Civil Procedure section 340, subdivision (c). We noted "that in some instances, the accrual of a cause of action in tort is delayed until the plaintiff discovered (or reasonably should have discovered or suspected) the factual basis for his or her claim. [Citation.]"  (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1248.)

We observed in *Shively* that the discovery rule "has been applied when the defamatory statement is hidden from view as, for example, in a personnel file that generally cannot be inspected by the plaintiff."  (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1249, citing *Manguso v. Oceanside Unified School Dist.* (1979) 88 Cal.App.3d 725.)  In *Manguso*, a teacher sued her former principal for placing a letter containing allegedly libelous statements in the teacher's confidential personnel file in 1960.  For 16 years, the teacher's attempts to gain employment were frustrated when prospective employers read the letter.  In 1976, the teacher discovered that the letter existed and filed an action for defamation within six months.  The Court of Appeal held that the teacher's cause of action had not accrued until she learned of the existence of the letter because she could not reasonably have been expected to discover the basis for her cause of action before

---

[3]    We need not determine in the present case whether our holding in *Shively* that the statute of limitations begins to run when the publication is first generally distributed to the public applies in the present case in which the interview was given only a limited distribution, because the parties agree that the statute of limitations began to run when the transcript of the interview was published in 1993.

then:  " ' " " 'The statute of limitations is a statute of repose, enacted as a matter of public policy to fix a limit within which an action must be brought . . . and is intended to run against those who are neglectful of their rights and who fail to use reasonable and proper diligence in the enforcement thereof. . . . The underlying purpose of statutes of limitations is to prevent the unexpected enforcement of stale claims concerning which persons interested have been thrown off their guard by want of prosecution.' [Citations.]" If the plaintiffs' allegations of lack of knowledge are sustained they cannot be accused of being neglectful of their rights or of using reasonable and proper diligence to enforce them.  It is not the policy of the law to unjustly deprive one of his remedy. . . .' [Citation.]"  (*Manguso v. Oceanside Unified School Dist.*, *supra*, 88 Cal.App.3d 725, 730.)

The *Manguso* court recognized that the " ' "*principal purpose*" ' " of the discovery rule " ' "is to protect aggrieved parties who, with justification, are ignorant of their right to sue." [Citations.]' "  (*Manguso v. Oceanside Unified School Dist.*, *supra*, 88 Cal.App.3d 725, 731.)  Thus, the court reasoned, statutes of limitations " 'should not be interpreted so as to bar a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence.' [Citation.]"  (*Ibid*.)

In *Shively*, we distinguished *Manguso*, noting that "courts uniformly have *rejected* the application of the discovery rule to libels published in books, magazines, and newspapers," stating that "although application of the discovery rule may be justified when the defamation was communicated in confidence, that is, 'in an inherently secretive manner,' the justification does not apply when the defamation occurred by means of a book, magazine, or newspaper that was distributed to the public. [Citation.]' "  (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1250-1251, citing *McGuiness v. Motor Trend Magazine* (1982) 129 Cal.App.3d 59, 61 ["California follows the well-established rule that for purposes

of the statute of limitations the cause of action accrues 'upon the first general distribution of the publication to the public.' [Citations.]"].)

The transcript at issue here was not published in an inherently secretive manner as was the letter in *Manguso*; although not widely distributed, the transcript was available to the public. Rabbi Lipner became aware of the transcript when a colleague discovered it while conducting research for a book about him. As we stated in *Shively*, the discovery rule has been applied to defamation cases "when the defamatory statement is hidden from view as, for example, in a personnel file that generally cannot be inspected by the plaintiff. . . . The cases turn upon the circumstances in which the defamatory statement is made and frequently involve a defamatory writing that has been kept in a place to which the plaintiff has no access or cause to seek access." (*Shively v. Bozanich*, *supra*, 31 Cal.4th 1230, 1249.) Because plaintiffs in the present case had access to the document from the time it was published, the discovery rule does not apply.[4]

In the present case, as noted above, the parties agree that plaintiffs' cause of action for defamation accrued under the single-publication rule no later than 1993, when the Goldman interview was published. And, as explained above, the discovery rule does not delay the accrual of the cause of action, even though the interview received only limited circulation. Accordingly, the superior court properly granted defendants' motion for summary judgment on the ground that

---

[4]     We express no opinion on how the rule might operate if a plaintiff pleaded that the defendant had intentionally published defamatory material in some obscure location, intending to use the single-publication rule to shield a market-flooding publication made after the statute of limitations had run. (See *Dominiak v. National Enquirer* (Pa. 1970) 266 A.2d 626, 629; *Hartmann v. American News Co.* (W.D.Wis. 1947) 69 F.Supp. 736, 738-739; Note, *The Single Publication Rule in Libel: A Fiction Misapplied*, *supra*, 62 Harv. L.Rev. 1041, 1043.)

plaintiffs' action was "barred by the one-year statute of limitations set forth in California Code of Civil Procedure section 340[, subd. (c)]," and the Court of Appeal erred in reversing the resulting judgment.

**DISPOSITION**

The judgment of the Court of Appeal is reversed.

MORENO, J.

WE CONCUR:  BAXTER, J.
                 CHIN, J.
                 CORRIGAN, J.
                 MALLANO, J.*
                 MANELLA, J.**

---

\*      Associate Justice, Court of Appeal, Second Appellate District, Division 1, assigned by the Acting Chief Justice pursuant to article VI, section 6, of the California Constitution.

\*\*     Associate Justice, Court of Appeal, Second Appellate District, Division 4, assigned by the Acting Chief Justice pursuant to article VI, section 6, of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**

In *Shively v. Bozanich* (2003) 31 Cal.4th 1230 (*Shively*), the plaintiff sued for defamation based on statements in a book that had been widely disseminated to the general public.  Applying the single-publication rule, this court in *Shively* explained that "for any single edition of a newspaper or book, there [is] but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or book [are] distributed." (*Id.* at p. 1245.)  *Shively* left open the issue of the "applicability of the single-publication rule to written publications that receive an *extremely limited distribution* . . . ." (*Id.* at p. 1245, fn. 6, italics added.)  Today, the majority holds that the rule does apply in that situation.  I agree.

But I disagree with the majority's additional holding that the discovery rule, which postpones accrual of certain tort causes of action until the plaintiff knew or reasonably should have discovered the grounds for the cause of action, does not apply here.  Not to apply this rule in cases like this one is, in my view, unjust because it effectively deprives many defamation victims of any opportunity to obtain compensation for the harm done to their reputation.

**I**

In 1990 the Jewish Community Federation of San Francisco, the Peninsula, Marin and Sonoma Counties (Federation) and the San Francisco Jewish Community Endowment Fund (Endowment Fund) provided funding for oral histories of past presidents of the Federation.  Defendant Richard N. Goldman is a past president.

In 1992, Elizabeth Glaser, an employee of the Regional Oral History Office (ROHO) of the Bancroft Library at the University of California at Berkeley, conducted four interviews of Goldman.  In talking about plaintiff Rabbi Pinchas

Lipner, the founder and dean of plaintiff Hebrew Academy of San Francisco (Hebrew Academy), Goldman said that Lipner "doesn't deserve respect for the way he conducts his affairs," is not honorable, has done little for the community, is an embarrassment, and was "run out of other communities before he got here." Goldman also said that on occasion when Rabbi Lipner, who was a survivor of the Holocaust in World War II, "would walk into the room [at the Hebrew Academy school], the children would stand at attention as if it were the Fuhrer walking in."

The ROHO interviews were transcribed and, after editing by defendant Goldman, were bound into a single volume. In 1993, ROHO published the copyrighted document. Between 1993 and 2003, ROHO sold 37 copies of the transcript. Of these, 15 copies were acquired by Goldman and 12 copies by the Federation. Of the remaining 10 copies, three were acquired by the Bancroft Library's ROHO; two by the New York Public Library; two by the Magnes Museum in Berkeley; one by Temple Emanu-El in San Francisco; one by the Charles E. Young Research Library at the University of California at Los Angeles; and one by an individual in Washington, D.C. (The Bancroft Library restricts access to such materials by the general public. The record does not disclose whether the other institutions have similar restrictions.) Thus, over a 10-year period, no more than 10 copies of the oral history transcript at issue were disseminated nationwide, with no distribution to the general public.

In 2001, Miriam Real, the founder in 1978 of an organization called Oral History Associates, was doing research for a book she was writing about Rabbi Lipner and the Hebrew Academy. From 1968 until 1979, Real had held the same job at ROHO as Elizabeth Glasner, who, as mentioned above, in 1992 conducted the oral history interviews of Goldman. In August 2002, Real became the director of admissions at the Hebrew Academy. While doing preliminary research in 2001 for her book, Real learned that ROHO had done a series of oral histories of the Federation's past presidents. Because transcripts of oral histories at the Bancroft

Library were kept in stacks not accessible to the public, Real looked through the library's card catalogue for oral history transcripts that might contain information she needed for her research project.  As the library did not permit patrons to make copies, Real filled out a form requesting that specified pages of certain oral histories be copied and sent to her.  After receiving those copies in the mail, Real on December 28, 2001, discovered the statements that defendant Goldman in 1992 had made about Rabbi Lipner; that same day, Real faxed copies of Goldman's statements to Rabbi Lipner.

Less than one year later, on November 18, 2002, Rabbi Lipner and the Hebrew Academy brought this action for defamation against Goldman, the Federation, and the Endowment Fund.  Defendants successfully moved for summary judgment.  The trial court ruled that the action was barred by the one-year statute of limitations (Code Civ. Proc., § 340, subd. (c)), and it found inapplicable the discovery rule, which postpones accrual of certain tort causes of action until the plaintiff knew or reasonably should have discovered the basis of the cause of action.  The Court of Appeal reversed.

## II

Statutes of limitations set forth the periods beyond which a cause of action may not be brought.  (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 532.)  They are statutes of repose, intended to preclude lawsuits by those who have not been diligent in enforcing their rights.  (*Manguso v. Oceanside Unified School Dist.* (1979) 88 Cal.App.3d 725, 730.)

The limitations period begins upon accrual of a cause of action.  (Code Civ. Proc., § 312.)  *Generally,* a cause of action accrues " 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' "  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397.)  To put it another way, accrual " 'sets the date as the time when the cause of action is complete with all of its elements [citations] — the elements being generically

3

referred to by sets of terms such as 'wrongdoing' or 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury' [citations]." (*Ibid.*)  "To avoid the harsh and unjust effects" that "rigid adherence to the general rule of accrual" may have (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 462, p. 582), both the Legislature and the courts have created certain exceptions to that rule.

The exception pertinent here is the discovery rule.  (*Norgart v. Upjohn Co., supra,* 21 Cal.4th at p. 397.)  As noted earlier, this rule postpones accrual of certain tort causes of action until the plaintiff knew or should have discovered the basis for the cause of action.  (*Shively, supra,* 31 Cal.4th at p. 1248; *Norgart v. Upjohn Co., supra,* 21 Cal.4th at p. 397; *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 179.)  As this court explained in *Shively, supra,* 31 Cal.4th at page 1248, the discovery rule comes into play "when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand."

Nearly three decades ago, the Court of Appeal in *Manguso v. Oceanside Unified School Dist., supra,* 88 Cal.App.3d 725, applied the rule to a defamation action based on libelous material contained in a confidential personnel file.  (See 3 Witkin, Cal. Procedure, *supra*, Actions, § 512, p. 643.)  Recently, in *Shively, supra,* 31 Cal.4th at page 1248, this court acknowledged that "it may be appropriate to apply the discovery rule to delay the accrual of a cause of action for defamation or to impose an equitable estoppel against defendants who assert the defense after the limitations period has expired."

When, as here, the defamatory statements are contained in a document of extremely limited distribution, application of the discovery rule seems particularly appropriate.  As mentioned on page 2, *ante*, in the 10-year period relevant here, *no more than 10 copies* of the oral history transcript at issue were disseminated nationwide:  nine were acquired by institutions and one by an individual.  Until

4

Real in December 2001 told plaintiff Lipner what defendant Goldman had said about him in 1992 (Goldman's oral history statements were published in 1993), Lipner had no reason to suspect, much less know, that someone had made disparaging statements about him, or that a transcript of those statements existed in the dark recesses of oral history collections at a handful of libraries.  Tellingly, even defendant Goldman holds that view.  When asked at his deposition in 2004 whether he was "aware of any means by which Rabbi Lipner would have been aware that you had made these statements about him," Goldman answered, "Obviously, not."

Yet the majority refuses to apply the discovery rule here.  It holds that under the applicable one-year statute of limitations the defamation action should have been brought no later than 1994 because publication of the statements occurred in 1993.  (Maj. opn., *ante,* at p. 12.)  The premise of the majority's holding appears to be that the 1993 publication of these oral history transcripts gave plaintiffs access to them.  (*Ibid*.)  But as this court observed in *Shively, supra,* 31 Cal.4th at page 1249, a defamation plaintiff must first have "cause to seek access," that is, a reason to suspect wrongdoing.  In 1993, plaintiff Lipner lacked such cause.  As I have pointed out, here it was only in December 2001 that Rabbi Lipner learned from Real that while doing research for her book about Lipner and the Hebrew Academy she came across the transcript of defendant Goldman's 1992 oral history interviews in which he had made disparaging comments about Lipner.  Does the majority expect all of us to conduct regular searches of oral history archives on the off chance that some oral history interview transcript may contain defamatory statements about us?  Absent some basis to suspect that a defamatory statement has been made, no sane person will undertake this enormous task, and thus the burden that the majority imposes is unreasonable.  " '[S]tatutes of limitations are intended to run against those who fail to exercise reasonable care in the protection and enforcement of their rights; therefore, those statutes should not

be interpreted so as to bar a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence.' " (*Manguso v. Oceanside Unified School Dist., supra,* 88 Cal.App.3d at p. 731.)

Unpersuasive is defendants' argument that plaintiff Lipner could have discovered the disparaging statements by researching the Internet.  Such a search would have revealed only the existence of an oral history of the Federation's past presidents, as Goldman was, and the names of libraries possessing transcripts of that history.

At what point in time plaintiffs Rabbi Lipner and the Hebrew Academy knew or reasonably should have discovered the disparaging statements by Goldman about Lipner presents a triable issue of material fact, one that however was never decided at trial because the trial court granted defendants' motion for summary judgment.  In reviewing that judgment, the court must independently review the record to determine the existence of a triable issue of material fact. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)  In performing that de novo review, the court must "view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor."  (*Ibid.*)  As I just pointed out, here there is a triable issue of material fact.  Thus, the trial court erred in granting defendants' motion for summary judgment.

I would affirm the judgment of the Court of Appeal.

KENNARD, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Hebrew Academy of San Francisco v. Goldman

———————————————————————————————————————————

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 129 Cal.App.4th 391
**Rehearing Granted**

———————————————————————————————————————————

**Opinion No.** S134873
**Date Filed:** December 24, 2007

———————————————————————————————————————————

**Court:** Superior
**County:** San Francisco
**Judge:** Ronald Evans Quidachay

———————————————————————————————————————————

**Attorneys for Appellant:**

Law Office of Paul Kleven and Paul Kleven for Plaintiffs and Appellants.

———————————————————————————————————————————

**Attorneys for Respondent:**

Carlson, Calladine & Peterson, Michael C. Cooper; Steefel, Levitt & Weiss and Barry W. Lee for Defendants and Respondents.

Horvitz & Levy, John A. Taylor, Jr., and Jeremy B. Rosen for Aeonix Publishing Group, The American Association of Law Libraries, The American Society for Information Science and Technology, The Association for Documentary Editing, The Association of Research Libraries, Bay Area Independent Publishers Association, The Independent Book Publishers Association, The Medical Library Association, The National Coalition for History, Nestlé USA, Inc., The Oral History Association, The Small Press Center, The Society of American Archivists, The Southern California Association of Law Libraries and The Special Libraries Association as Amici Curiae on behalf of Defendants and Respondents.

Christopher M. Patti; Munger, Tolles & Olson, Bradley S. Phillips and Ailsa W. Chang for The Regents of the University of California as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul Kleven
Law Office of Paul Kleven
1604 Solano Avenue
Berkeley, CA  94707
(510) 528-7347

Michael C. Cooper
Carlson, Calladine & Peterson
353 Sacramento Street, 16th Floor
San Francisco, CA  94111
(415) 391-3911

Jeremy B. Rosen
Horvitz & Levy
15760 Ventura Boulevard, 18th Floor
Encino, CA  91436-3000
(818) 995-0800