1  Kevin Vanginderen, Plaintiff Pro Per
   637 Third Ave., Suite E1
2  Chula Vista, CA  91910
   Telephone: (619) 585-7414
3

                                              FILED

                                        08 JUL 28  PM 2: 22

                                     CLERK, U.S. DISTRICT COURT
                                     SOUTHERN DISTRICT OF CALIFORNIA

4

                                        BY:        age        DEPUTY

5
                                                      NUNC PRO TUNC
6              UNITED STATES DISTRICT COURT
                                                        JUL 2 4 2008
7             SOUTHERN DISTRICT OF CALIFORNIA

8

9  KEVIN VANGINDEREN,              )      Case  No. 07-CV-2045-BTM-JMA
                                   )
10            Plaintiff,           )      Hon. Barry T. Moskowitz
                                   )
11        v.                       )      PLAINTIFF'S OPPOSITION TO
   CORNELL UNIVERSITY,             )      DEFENDANT'S MOTION FOR
12                                 )      ATTORNEYS' FEES
           Defendant.             )
13                                 )      Hearing Date: August 22, 2008
                                   )      Time:        11:00 a.m.
14 _____)      Place:       Courtroom 15

15        Plaintiff Kevin Vanginderen hereby objects to the Motion for Attorneys' Fees filed by

16 Defendant Cornell University on July 2, 2008.  A Notice of Appeal was filed in the above

17 captioned matter on June 13, 2008, with jurisdiction transferred to the Ninth Circuit Court of

18 Appeals.  The Defendant's decision to amass exorbitant legal expenses in a failed effort to

19 preclude all future legal liability when it may place a newly "digitized" version of any publication

20 upon the Internet regardless of the content, should not be borne by the Plaintiff.

21        The Defendant's overzealous behavior in regard to this matter (See Exhibits 1,2 and 3),

22 has led to a theater of the absurd.  This Court's recent controversial decision (*See United States v.*

23 *Amodeo, 44 F.3d at 145)* to allow any document submitted to it to become instantly a part of a

24 public record which is then immediately published upon the Internet prior to any judicial scrutiny

25 has resulted in the Defendant's perversion of this case into an excessive display of legal

26 fireworks.  The Defendant's desire to portray the litigation in this case as a penultimate test of its

27 First Amendment rights has resulted in an astounding legal expenditure without even an Answer

28 having ever been filed in this matter.

1      From the outset, and curiously before the Defendant even presumably had any access to a

2  sealed record, the Defendant had decided this case as a frivolous one in which the Plaintiff could

3  never prevail.  The Defendant immediately filed a vigorous 25 page anti-SLAPP motion many

4  weeks before it obtained an Order to Unseal Records and was even capable of determining the

5  potential truth of the matter asserted within the Libel claim.  From the start, the Defendant's

6  representative declared the matter "unwinnable" and regarded "legally irrefutable" circumstances

7  regarding the truth of the matter asserted.  (See Exhibit 4)  The Defendant, however, chose to

8  undertake a rabid defense of the matter with the hiring of five high priced attorneys who have

9  now published an entire previously sealed record upon the Internet in an effort to scare off any

10  future potential litigants. The Defendant's vindictive scorched earth policy of twisting the truth

11  while degrading the Plaintiff and needlessly invading his privacy was undertaken with the

12  ultimate goal of simply enhancing corporate profits.

13      The Defendant has taken the tenuous position that if it does not itself declare a privacy

14  policy that it then is somehow immune for liability for any invasions of privacy in any forum.  It

15  has publicly declared that it believes that privacy rights recognized by the United States Supreme

16  Court within the Constitution do not apply to itself simply because it is not a government entity.

17  (See Exhibit 5)  The Defendant also falsely believes that it is only liable for torts under the case

18  law of the state in it resides and refuses to recognize that when it "digitizes" material upon the

19  Internet, it has placed itself under the jurisdiction of every locale where the Internet may be

20  accessed.  The case at bar falls within the jurisdiction of the State of California, a state which

21  possess case law that does recognizes legal liability for a number of invasion of privacy torts by

22  non government entities.  The Defendant's reckless position on this matter has resulted in

23  excessive and unreasonable legal expenses that should not be the liability the Plaintiff.

24      The Defendant has presented the majority of its argument, and procured the bulk of its

25  resulting legal fee expenses, as part of a futile effort to obtain a desired ruling that would

26  presumably declare that its massive "digitization" of old print material in a newly displayed

27  Internet version is somehow not a new publication of that material.  This is a ruling it clearly did

28  not or should not receive.  The Defendant's current suspect position on this matter directly

1  contradicts its own recently stated policy of refusing to "digitize" material it recognizes as

2  potentially copyright protected. (See Exhibit 6) It is impossible to reconcile how the Defendant

3  could vehemently argue in the case at bar that newly "digitized" material which is presented for

4  the first time upon the Internet is not somehow a new publication of such material while it does

5  also recognize its legal liability for copyright infringement if it were to present a new Internet

6  publication of copyright protected material currently within its library collection. The resulting

7  legal expenses of this frivolous argument are unreasonable and should not be the liability the

8  Plaintiff.

9      From the outset of this matter and prior to litigation, the Defendant has assigned Attorney

10  Nelson Roth, an attorney licensed in the State of California, as its representative in this matter.

11  He alone, could and should have, handled this entire matter with just a single week of effort in

12  unsealing a record and submitting the resulting relevant evidence with which the Defendant

13  believed may prove the truth of the matter asserted in the Libel claim. That is the only material

14  on which this Court has relied to make a decision to strike. The Defendant could and should

15  have litigated this matter with the legal expense of the one week salary of it's in-house counsel.

16  Instead it chose to hire a multitude of prominent and expensive attorneys from a prominent Los

17  Angeles law firm in an effort to obtain some pie in the sky all encompassing legal ruling that it

18  believed would exonerate itself from any legal liability for publishing anything of its choosing

19  upon the Internet. The Plaintiff should not bear the cost of this frivolous endeavor.

20      The bottom line in this matter is that the Plaintiff remains adamant that a jury would

21  ultimately find that he was not charged in connection with fifteen crimes as the underlying

22  libelous article contends. He remains certain, despite the ruling against him, that the Defendant

23  has not, and could not, establish that fifteen crimes had even occurred and that the purported

24  evidence presented to this Court could not possibly indicate he may be responsible for even half

25  that number. The Plaintiff also remains adamant that a jury would find the offending article is

26  not newsworthy outside the context of this case as it was republished twenty four years after it

27  was first put in print. He is optimistic that the Ninth Circuit Court of Appeals will ultimately

28  recognize such and remand the matter for a jury trial on these issues. Should this Court decide

3

1  that as a result of his justifiable beliefs that he is not only not entitled to a jury trial on these

2  issues, but also he is also responsible for a sixty five thousand dollar legal bill while the matter is

3  under appeal, a grave injustice will result.

4          The Plaintiff respectfully requests the Motion for Attorneys fees be denied or adjusted to

5  one week's salary of Defendant Attorney Nelson Roth.

6

7  Dated: July 23, 2008

8

9                                         Kevin Vanginderen, Plaintiff in pro per

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# EXHIBIT 1

Case 3:07-cv-04-Brthus in Suit Over Digitized Material 07/28/2008 Technology4Teacher... Page 7 of 30

# Technology4Teachers.com

Providing

Educational Technology News To Educators Since 1997

home | winksite | mobi | about | subscribe | contact

**Conference Images**



**User login**

Username: *

Password: *

Log in

- Request new password

**Navigation**

° Recent posts

**Poll**

According to a recent survey, 61 percent of mobile users would vote via text message for President of the US. Would you?:

Yes

No

Home

## Cornell U. Prevails Over Alumnus in Suit Over Digitized Material

Cornell University scored a victory this week when a federal judge dismissed a $1-million lawsuit from an alumnus who accused the university of libeling him and disseminating private information about him online. The alumnus, Kevin Vanginderen, was angered that information about his run-ins with the law as a Cornell student were easily accessible on the Web via a Google search. The information was on the Web because the university library digitizes the Cornell Chronicle, a university newspaper, and a 1983 issue of the paper detailed Mr. Vanginderen's alleged involvement in campus thefts.

Mr. Vanginderen, now a lawyer, asked Cornell to remove references to him from the digitized version of the Cornell Chronicle. The university declined.

The judge, Barry Ted Moskowitz, of the U.S. District Court in San Diego, Calif., concluded Tuesday that because the news information about Mr. Vanginderen was mostly accurate, the university did not defame him.

The judge sidestepped the larger issue raised by the case: Are college libraries obligated to expunge embarrassing and false information about someone from their digital archives? Nelson Roth, Cornell's deputy university counsel, said because the case concerned this question, the university chose to vigorously defend itself against the lawsuit. If

Vote

**Who's online**
There are currently *0 users* and *2 guests* online.

**Syndicate**

archivists "were required to go back and fact check information readily available on the shelf, it would bring digitization to a grinding halt," he said during a phone interview. And Anne R. Kenney, Cornell's chief librarian, said the library has no plans to alter it digitization procedures as a result of the case. — Andrea L. Foster

| Read original article.

**Technology4Teachers.com - An Educational Technology News Aggregation Site**
Most articles posted here are the work of authors who voluntarily and freely share their work through syndication. I would encourage you to click on the "Read original article" link of the post to leave the comment on the origination site.

Happiness is often doing what you want to do. Longevity is, quite often, doing what's right. Life is, more often than not, balancing what gives you happiness versus that which gives you longevity

# EXHIBIT 2

Andrea L. Foster
libraries, copyright, and virtual reality

Jeffrey R. Young
video, audio, and how technology is changing scholarship and teaching

**Need more tech news?**
Read our complete IT section.

**Search**

| Go

**Categories**

Campus Piracy
Company Watch
Distance Education
Gadgets
Leadership
Legal Troubles
Libraries
Offbeat
Open Access
Research
Search Engines
Security
Social Networking
Student Life
Supercomputing
Teaching
TechForum2008
Video
Virtual Worlds
Wikis

**June 6, 2008**

## Cornell U. Prevails Over Alumnus in Suit Over Digitized Material

Cornell University scored a victory this week when a federal judge dismissed a $1-million lawsuit from an alumnus who accused the university of libeling him and disseminating private information about him online. The alumnus, Kevin Vanginderen, was angered that information about his run-ins with the law as a Cornell student were accessible on the Web via a Google search. The information was on the Web because the university library digitizes the *Cornell Chronicle*, a university newspaper, and a March 1983 issue of the paper detailed Mr. Vanginderen's alleged involvement in campus thefts.

Mr. Vanginderen, now a lawyer, asked Cornell to remove references to him from the digitized version of the *Cornell Chronicle*. The university declined.

The judge, Barry Ted Moskowitz, of the U.S. District Court in San Diego, Calif., concluded Tuesday that because the news information about Mr. Vanginderen was mostly accurate, the university did not defame him.

The judge sidestepped the larger issue raised by the case: Are college libraries obligated to expunge embarrassing and false information about someone from their digital archives? Nelson Roth, Cornell's deputy university counsel, said the university believes the answer to that question is no, and thus chose to vigorously defend itself against the lawsuit. If archivists "were required to go back and fact check information readily available on the shelf, it would bring digitization to a grinding halt," he said during a phone interview. And Anne R. Kenney, Cornell's chief librarian, said the library has no plans to alter its digitization procedures as a result of the case. —*Andrea L. Foster*

Posted on Friday June 6, 2008 | Permalink |

**Comments**

1.  As long as the information contained in the documents is factual, there is no error. The lawyer is an ass and Cornell is in the right.

    — Al   Jun 6, 06:39 PM   #

# EXHIBIT     3

# The Cornell Daily Sun

Forgot Password? | Register

News    Sports    Opinion    Arts    Eclipse    Blogs    [Search]

## Blast from the past
June 15, 2008 - 2:15pm

Print: 🖨 Email: ✉ Share: f ▾

Kevin Vanginderen '83 sued the Chronicle for libel when this article, first printed 25 years ago, was made available online last year.

Courtesy Cornell Chronicle

Excerpt from the March 17, 1983 issue of the "Cornell Chronicle:"

# Blotter Barton

Department of Public Safety officials have charged Kevin G. Vanginderen of 603 Winston Court Apartments with third degree burglary in connection with 10 incidents of petit larceny and five burglaires on campus over a period of a year. Safety reported recovering some $474 worth of stolen goods from him.

Also, according to the morning reports of the department for the period March 7 through 13, there were 23 thefts on campus involving a total of $1,860 in cash and valuables. These included five wallets and one purse with contents estimated at $269. Three license plates were stolen from cars parked at various locations on campus.

Safety recovered a $1,000 computer terminal stolen from a room in Uris Hall. Based on an anonymous phone call, safety officials found the terminal and a desk phone in a parking lot in Ithaca.

Two students were referred to the Judicial Administrator for walking on the hoods of cars in the West Campus Parking Lot. Two automobile tires valued at a total of $240 were slashed on a car parked in front of 726 University Avenue.

Add new comment    Thumbnail    Inline    Printer-friendly version

**eCornell Online**
Official site of eCornell, wholly owned by Cornell University

**Cornell Fan Apparel**
Visit Us for New and Vintage Licensed Ivy League Fan Apparel

Ads by Google

**Advertise with The Sun**
Put your own ad here! Click to learn more about advertising on CornellSun.com!

**See Your Text Ad Here!**
Learn more about text link ad opportunities! Contact onlineadvertising@cornellsun.com

**This Space For Sale**
Buy an ad on CornellSun.com today!

**Eclipse: The Cornell Daily Sun**
The Sun's new weekend edition! Articles about campus life and other off-beat stories.

**Advertise with The Sun**
Join The Sun | About CornellSun.com | About The Sun | Contact Us | Privacy Policy
Posts and Comments are the exclusive property of their owners.
All other content © 2008 The Cornell Daily Sun
All Rights Reserved.

**Cornell Apparel** Buy Your Big Red, Sweatshirts Hats, Outerwear, Jerseys, Tee's

**Kevin** Huge selection, great deals on Kevin items.

**Ivy League Admissions** Strategies and Trends From Former Ivy League Admissions Officers

Ads by Google

### Recent Updates by Topic
Administration ap Barack Obama china City clinton common council construction democrats disaster diversity election election 2008 iraq Ithaca College lawsuit politics provost Provost Departure Biddy Martin research Student Assembly sustainability Tompkins County University Assembly war on terror

Comment on this feature!

**Kevin** Looking for Kevin? Find exactly what you want today.

**Ithaca Ny Apartments** Browse Ithaca Ny Apartments.

**Ithaca Apartment Rentals**

**Apartments Near Cornell**

Ads by Google

# EXHIBIT    4

**PROSKAUER ROSE LLP**

2049 Century Park East
Suite 3200
Los Angeles, CA  90067-3206
Telephone 310.557.2900
Fax 310.557.2193

BOCA RATON
BOSTON
LONDON
NEW ORLEANS
NEW YORK
NEWARK
PARIS
SÃO PAULO
WASHINGTON

**Bert H. Deixler**
Member of the Firm

Direct Dial 310.284.5663
bdeixler@proskauer.com

October 31, 2007

**Via Federal Express**

Kevin Vanginderen, Esq.
637 3rd Avenue, Suite E-1
Chula Vista, CA 91910

Re:    Kevin Vanginderen v. Cornell University

Dear Mr. Vanginderen:

You will recall that we spoke on October 16, 2007, and in that conversation I informed you that
our firm had been engaged by Cornell University in connection with the action you had filed
against Cornell.  In that conversation I informed you that it was my opinion that your claims
were meritless and that we would promptly remove the case to United States District Court and
thereafter file an anti-SLAPP motion pursuant to California Code of Civil Procedure § 425.16.

As you are aware, we have removed the case as promised.  Enclosed is a copy of the
Memorandum of Points and Authorities in Support of Special Motion to Strike, together with the
Request for Judicial Notice and related declarations, which we intend to file by 5:00 p.m. Friday,
November 2, 2007.

Cornell has decided that it would afford you one last clear chance to dismiss the action with
prejudice rather than litigating publicly what appear to be the legally irrefutable circumstances
surrounding your arrest and conviction in 1983.  I would add my personal urging because I
believe that the case is both unwinable for you and unlikely to enhance your reputation in the
communities in which you work and live.

Please inform me no later than 5:00 p.m. Pacific time on November 1, 2007, that you have filed a
dismissal of the action with prejudice in the United States District Court and supply me with a
copy of that electronic filing.

7521/21177-001 Current/10250537v1

PROSKAUER ROSE LLP

October 31, 2007
Page 2

If I haven't received that assurance, coupled with the written confirmation, Cornell will proceed with the anti-SLAPP motion and when it is granted will seek and collect attorneys' fees attendant to the bringing of that motion.

Very truly yours,

Bert H. Deixler

BHD:pr

Enclosures

# EXHIBIT 5

Skip to main content



## Cornell University
## Office of Information Technologies

Cornell University Office of Information Technologies

SEARCH: [          ] go

    OIT     Cornell more options

- IT Policy Home
- Policies
- Programs
- Articles
- Issues

# IT Policy Office

**ACUTA Journal of Telecommunications in Higher Education**
**Fall 2002, Vol. 6, No. 3**

# Privacy on Today's Electronic Campus

### by Tracy Mitrano, Cornell University

New technology generates new anxieties -- often with good reason. The trade-offs of one generation are not always the same for another generation with different expectations of efficiency, privacy, and social order. The popularization of the transportation and communications industries -- from trains to planes and telegraphs to telephones -- produced a long litany of contract and tort cases, not to mention reams of regulations and volumes of administrative law.

In light of the remarkable technologies that have made electronic communications a popular and significant component of the American economy, it is no wonder that electronic communications have raised a wide range of new questions and concerns about Internet service provider liability, Internet governance, legal strictures for government surveillance, and privacy in general. Perhaps the main reason is that people feel to personal about their computer usage.

The psychological intimacy between people and their computers sharply contrasts with the fact that network operators can see electronic communications, governments with proper authorization can intercept transmissions or obtain stored data, and snoops or hackers can all too easily *sniff* communications or trespass into an individual's computer. For those who have used electronic communications to express personal emotions or political thoughts, it is a shock to learn that their message has been posted on the Web or widely circulated as the result of easy forwarding. Electronic

diaries and wills have been sent out as documents as the result of a computer virus. The sniffing out of a credit card or social security number produces obvious credit problems. Harassing or defamatory messages put on the Web for the entire world to see can be a psychic blow that leads to questions of trust and privacy and strikes the mystic cords that bind people to their society.

**Technology**

So what are the rules -- technical, legal, and ethical -- that shape this very uncertain reality of the privacy of electronic communications? Technically, people should be prepared to accept that network operators can see virtually any unencrypted communication. In cases where the operators are performing necessary business functions, they do, in fact, sometimes use such communications. Notwithstanding the common analogy that an e-mail is like a postcard going through the United States Postal Service, the more accurate comparison would be telephone operators or technicians who could break into live communications in the course of their duties.

One distinction to make between both of these analogies and electronic communication is that in neither the postal nor the telephonic world are backups or network logs maintained that provide yet another avenue for retrieval of communications and/or data after the fact. People are often surprised to learn that their own computers contain records of every Web site visited. The capacity and volume of information that network communications contain constitute a quantum leap of trace and tracking ability that understandably makes people nervous. And even if it could be established that no social or political entity conspired to make this technology so transparent, it simply feels unnerving to discover that the privacy of communications is not what it used to be.

**Law**

Two federal criminal laws speak directly to the legal and ethical concerns regarding electronic privacy. First, the Computer Abuse Act, Title 18 of the criminal code, section 1030 specifically, renders computer trespass -- not just rattling the doorknobs but actual penetration, retrieval, or damage -- and destructive programs such as worms and viruses illegal. Second, the Electronic Communications Privacy Act (ECPA) establishes a privacy of electronic communications at a standard similar to the wiretapping act of the late 1960s. In short, the disclosure of any information by an Internet service provider to the public is actionable. Since Congress amended ECPA in 1994 to include wireless communications, sniffing is uncharted legal territory, given that the spectrum in which wireless communications operate is public.[1]

Almost certainly reading the text of a communication would support at least a cause of action, especially if that communication was disclosed to the public. Disclosure is regulated even for those who fall under some of the exceptions to ECPA, such as network operators who access communications in the normal course of business or law enforcement with an administrative, executive, or court order to access transmissions and data. If a network operator working in the usual course of business uncovers the extramarital affair of a famous person, for example, it is against the law to disclose it. Likewise, if in the course of an investigation, law enforcement discovers legal but potentially damaging information about an individual, say the homosexuality of a closeted person (in a state with no sodomy laws), it may not disclose that information. The singular exception to the exception is when consent is given by one party to a communication to disclose information of the second party; such disclosure is not actionable.

State tort laws offers another dimension to this issue. Claims such as defamation, misappropriation of likenesses, or invasion of privacy -- together with state sexual harassment laws -- offer opportunities for ambitious attorneys to carve out a specialized niche in tort and civil plaintiff Internet law. Actions in this

Privacy in Today's Electronic Campus

area are still very sparse and have yet to yield a clear directon of the law, and so remain speculative at best. Such speculation leads to another question, however: What about the ethical dimensions of exposure on the World Wide Web? I have a personal example.

I was teaching my 10-year-old son how to do a search when he suggested that we search my name. To my surprise there appeared a title, "The shit hits the fan ..." In my role as copyright agent for the university under the Digital Millennium Copyright Act of 1998, I had sent a student a form notice of copyright infringement. He had sent it on to a friend at another university who posted the notice on the Web with that opening phrase. Since the recipient consented to the posting, I have no cause of action in criminal law, and since it does not allege anything defamatory about me, I have no private claim either. (It most certainly would have been a violation of the Buckley Amendment, or the Family Education Records Privacy Act, for me as an agent of the university, to post the information.) But still, it is a gratuitous posting. I acted as an employee of the university, yet the search turned into something personal about me.

> The capacity and volume of information that network communications contain constitute a quantum leap of trace and tracking ability that understandably makes people nervous.

I decided to contact the student, not as an employee of the unversity but as a private individual on my home computer and with my private e-mail address. I asked him to redact my name and the name of another employee. He never did. Given the minor significance of this incident, I present it as an example of an ethical question. In lieu of law, how do we, as citizens of the United States and of the world of Internet users, articulate an ethics of electronic media?

## Cornell University Policy

Where law treads, policy is sure to follow. Law -- from Middle English, "to lay down" -- represents the floor of acceptable behavior, a level of performance beneath which an individual or institution courts liability. Policy -- from the ancient Greek, "polis" or "citizen" -- speaks to higher principles that incorporate foundational social and political notions of rights and responsibilities of teh individual to the group, and of the group to and for the individual. To be sure, policy does not fill the gap between the law and ethics completely. To draw upon the example explored above, it is important to note that not even policy would have addressed my concerns. The fan material is not posted on the Cornell University network, but even if it were, the university does not have a policy against posting it. To the contrary, the university's Policy on Responsible Use of Electronic Communications holds forth on free speech that does not violate law or policy in such a way that it would have been a violation of policy for me, as an officer of the university, to use my authority to remove it!

Such strictures define the obligations that the university undertakes to protect its constituents. Conversely, intervening in cases where individual students interfere with the activity of others and establishing ground rules of responsible use and security are obligations the university exercises to maintain order and to teach responsible use. Such intervention prohibits bandwidth hogging, e-mail bombing, and sharing passwords. To adhere to those rules is the obligation of individuals who enjoy the privilege of network usage. Those rules are not codified in American law but they coudl potentially bring sanction upon constituents of the university who use the network in violation of them, which illuminates precisely how policy raises expectations of an individual's behavior. The policy reasons why those rules exist: to promote fairness, respect, and dignity -- if not a relative concept of privacy -- comport with the lofty mission of the university.

A note on the term *privacy* is worth making at this juncture. The concept of privacy in American law is largely a 20th-century phenomenon and has come to revolve around the debate over abortion or reproductive rights as they took shape in the civil rights movement of the 1960s. However much

ridiculed, Justice Goldberg's famous statement that the First, Third, Fourth, Fifth, and Ninth Amendments to the Constitution amount to a "penumbra" of privacy rights, otherwise not articulated as such by name in that august document, represent to date the best summary of how American constitutional law considers this nebulous area. It is equally important to remember that the Constitution protects against government action and not private entities. Thus, while privacy may have come the catchword for personal rights in the last half of the 20th century, those rights do not translate to al areas of experience and certainly not to private entities such as Cornell University.

## Policies on Privacy

The University Counsel's Office has made it clear to policy advisors across campus that their policies had best steer clear of the term *privacy*, lest it suggest or infer a set of rights to which the university is not obliged, and to which the university would not want to associate itself in policy as a matter of potential litigation. Nuanced terms such as *fair information practices* fill the gap that privacy policies might well play in state universities and other governmental institutions.

Another example of how the *public* and *private* distinction plays out is in the area of privacy rights for employees of any private network. Employees enjoy no privacy whatsoever. Every case that has asked questions about monitoring, snooping, sniffing, and consciously and intentionally looking at either transmissions or stored data of employees has found squarely for the employer, not the employee.

To its credit, Cornell, while reserving its right to monitor communications, has nonetheless stated in policy that it will not adopt those practices as a matter of normal business. The University Policy on Responsible Use states that while it reserves the right to control and access systems, it does not as a practice monitor data or usage. Important distinctions must be made among three discrete points. Technologically, systems operators can see, for example, e-mail or URLs passing through as transmissions. Yet, the equally true fact that more than 1 million e-mail messages pass through the Cornell network on average every day means that it is impossible to monitor them, even if the university did not hold itself to a higher ethical standard in policy. Thus, there is a difference between the technological ability to see e-mail and the practice of reading it. It is important to note, however, that as a matter of policy, in the course of standard business procedures, should system operators observe content of e-mail, they are obliged to maintain the confidentiality of it unless the content of what they observe violates law or policy or is evidence of immediate danger of life and limb, in which case they are obliged to report it.

Another variation on the theme of privacy of an individual's data on an electronic network is the question of how third parties can gain access to it. The Office of Information Technologies is sponsoring a policy on this matter, called Fair Information Practices for the Access of Data about Individuals Transmitted or Stored on Cornell Information Technologies Systems. Until such time as the university policy office issues it, it is the practice of the Office of Information Technologies and Cornell Information Technologies to provide information to third parties only on the request of the head of the subject's constituency (i.e., the vice president of Human Resources or Student Affairs, or the dean of faculty) or to law enforcement with proper authorization. Individuals may retrieve logging information about themselves if they present reasonable cause in a formal request to the policy advisor of Information Technologies. And then there is the question of sniffing. It may be murky in the law, but it is clear in policy. Cornell Information Technologies interprets the Cornell University Policy Regarding Abuse of Computers and Network Systems to make "sniffing" a violation.[2] And there are other matters too, such as the selling of e-mail addresses or the use of cookies for the collection of personal information about users--neither of which is a practice of Cornell Information Technologies, nor, in my humble opinion, should they ever be.[3]

**Conclusion**

Each generation will define *privacy* in the electronic world by setting the concept beside an array or external realities such as prevailing custom and law, technologies and practices, institutional policies, and ethical ideals. The tensions between the dual human impulses to preserve a personal environment and to accommodate the demands of society for survival inform that effort. Indeed, the electronic world will not change that dynamic, but will add to its many dimensions. We could choose to ignore the debate, but only with the most contemporary notions of privacy as this generation knows them hanging in the balance. Awareness, political discourse, and policy discussion will not eliminate the tension but animate it with creativity.

**Tracy Mitrano is policy advisor and director of computer policy and law, <u>Office of Information Technologies</u> at <u>Cornell University</u>. Reach her at <u>tmb3@cornell.edu</u>.**

Notes
[1] "Sniffing" is a slang term for interception of data communications. In telephone communications the analogous term is "tapping."
[2] http://www.cit.cornell.edu/computer/responsible-use/abuse.html
[3] Cornell Information Technologies does use cookies for network tracking information, but not personal information--content--about users. It does not sell e-mail addresses either, but, like so many institutions, has fallen prey to commercial interests harvesting addresses from its directories.

Return to Cornell University's <u>Privacy in the Electronic Realm</u> site

Comments or Questions: <u>it_policies@cornell.edu</u>
Page last updated: October 24, 2007

# EXHIBIT 6



## Cornell University Library

Cornell University Library

- 
- Search Cornell

HomePublicationsNews & Events ProceduresTemplates Contacts



# Library Communications

**FOR RELEASE:**
Contact: Ellen Marsh
Phone: (607) 254-4680
E-mail: ebm7@cornell.edu

**Cornell University Library becomes newest partner in Google Book Search Library Project**

ITHACA, N.Y. (August 7, 2007) — Cornell University Library is partnering with Google Inc. to digitize materials from its superb collections and make them available online.

"In its quest to be the world's land-grant university, Cornell strives to serve the scholarly and research needs of those beyond the campus. This project advances Cornell's ability to provide global access to our library resources and to build human capacity across the globe," said Cornell President David J. Skorton.

Google will digitize up to 500,000 works from Cornell University Library and make them available online using Google Book Search. As a result, materials from the library's exceptional collections will be easily accessible to students, scholars and people worldwide, supporting the library's long-standing commitment to make its collections broadly available.

"Research libraries today are integral partners in the academic enterprise through their support of research, teaching and learning. They also serve a public good by enhancing access to the works of the world's best minds," said Interim University Librarian Anne R. Kenney. "As a major research library, Cornell University Library is pleased to join its peer institutions in this partnership with Google. The outcome of this relationship is a significant reduction in the time and effort associated with providing scholarly full-text resources online."

Materials from Mann Library, one of 20 member libraries that comprise Cornell University Library, will be digitized as part of the agreement. Mann's collections include some of the following subject areas: biological sciences, natural resources, plant, animal and environmental sciences, applied economics, management and public policy, human development, textiles and apparel, nutrition and food science.

"Mann Library's collections complement the contributions of the other Google library partners. Whether talking about entomology or plant biology, nutrition or human ecology, Mann Library has outstanding collections in the agricultural and life sciences as well as the related social sciences," said Janet A. McCue, director of Mann Library. "Having

Google index our collections is like having a massive concordance to the information in our books."

Cornell is the 27th institution to join the Google Book Search Library Project, which digitizes books from major libraries and makes it possible for Internet users to search their collections online. Over the next six years, Cornell will provide Google with public domain and copyrighted holdings from its collections. If a work has no copyright restrictions, the full text will be available for online viewing. For books protected by copyright, users will just get the basic background (such as the book's title and the author's name), at most a few lines of text related to their search and information about where they can buy or borrow a book. Cornell University Library will work with Google to choose materials that complement the contributions of the project's other partners. In addition to making the materials available through its online search service, Google will also provide Cornell with a digital copy of all the materials scanned, which will eventually be incorporated into the university's own digital library.

## About Cornell University Library
One of the leading academic research libraries in the United States, Cornell University Library is a highly valued partner in teaching, research and learning at the university, offering cutting-edge services and a full spectrum of library resources, from rare books and manuscripts to a rapidly expanding network of digital resources. The Library has a collection of close to 8 million volumes in print and more than 60,000 journals, 300,000 e-books and 39,000 e-journals.

Through such initiatives as the life sciences portal, the installation of a pioneering high-end mobile and flexible computer laboratory designed specifically for collaborative use and innovative scholarly publishing support, the Library is an integral component of the many educational programs and research projects under way at Cornell. To learn more about Cornell University Library, visit library.cornell.edu.

More Information
FAQ
Google Books Library Project
Microsoft Digitization Project
BookSurge Partnership
Large Scale Digitization Wiki

Cornell University Library

### VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF** San Diego

    I have read the foregoing _____

_____ and know its contents.

[ ] **CHECK APPLICABLE PARAGRAPHS**

[ ]    I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

[ ]    I am [ ] an Officer [ ] a partner _____ [ ] a _____ of _____

_____

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. [ ] I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. [ ] The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

[ ]    I am one of the attorneys for _____

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on _____ , at _____ , California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____       _____
Type or Print Name              Signature

### PROOF OF SERVICE
1013a (3) CCP Revised 5/1/88

**STATE OF CALIFORNIA, COUNTY OF** San Diego

I am employed in the county of San Diego _____ , State of California.

I am over the age of 18 and not a party to the within action; my business address is: 637 Third Avenue, Suite E-1, Chula Vista, CA 91910

    On, 7/23/08 _____ I served the foregoing document described as A copy of the Plaintiff's Opposition to Defendant's Motion for Attorney's Fees

_____ on Defendant Attorneys _____ in this action

[ ] by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

[X] by placing [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as follows:

Bert Deixler, Esq., Proskauer Rose LLP, 2049 Century Park East, Suite 3200, Los Angeles, CA 90067-3206
Valerie Cross Dorn, Esq., Office of University Counsel, 300 CCC Building, Garden Ave., Ithaca, New York 14853

[X] **BY MAIL**

    [X] *I deposited such envelope in the mail at 637 Third Avenue, Chula Vista _____ , California. The envelope was mailed with postage thereon fully prepaid.

    [ ] As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at _____ California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on _____ , at _____ , California.

[ ]    **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee.

Executed on _____ , at _____ , California.

[X] (State)    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[ ] (Federal)    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Juan Ramirez _____       _____
Type or Print Name              Signature

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)
**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

Legal Solutions Plus    Rev. 7/99