USDC SCAN INDEX SHEET










JAH    1/30/01    13:53
3:99-CV-02705    MCREYNOLDS V. STANDARD INSURANCE
*58*
*RPLYOPPM.*

WARREN H. NELSON, JR. # 104744
A PROFESSIONAL CORPORATION
7400 El Cajon Boulevard, Suite 302
La Mesa, CA 91941-3417
Telephone: 619 466 9400
Facsimile: 619 466 9402

Attorney for Defendant
STANDARD INSURANCE COMPANY

FILED

01 JAN 29 PM 2:36

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONLEY G. McREYNOLDS, M.D., | Case No.: 99 CV 2705 IEG (JAH) |
| Plaintiff, | DEFENDANT STANDARD INSURANCE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| STANDARD INSURANCE COMPANY, et al. | Date: February 5, 2001<br>Time: 10:30 AM |
| Defendants. | Before the Hon. Irma E. Gonzalez |

Standard uses this Reply to analyze the issues under abuse of discretion and de novo review and demonstrate its entitlement to summary judgment. Standard responds in the Nelson Reply Declaration and Objections to Evidence, filed herewith, to the McReynolds, Rasmussen and Vavoulis Declarations.

A. <u>Standard wins if review is for abuse of discretion.</u>

• Dr. McReynolds (DGM) was a Member insured under the Policy Standard issued to North Coast and claimed disability as of February 24, 1997. 1st Am Compl ¶¶ 6, 10. Standard repeatedly advised DGM that the North Coast coverage had terminated as of

March 1, 1997. ND ¶ 2 Ex 1-58, 71, 142, 149 (00113, 00217, 00301, 00322). DGM never questioned this before now.

- DGM was always represented by lawyers and accountants, including Edwards, Sooy, et al., Glen Rasmussen, Edwina Sparks, CPA, and Mr. Gilmore. ND ¶ 2 Ex 1-100, 147, 148, 157(00247, 00312-00313, 00400). At no time has DGM offered evidence from an accountant to support his claim.

- DGM worked at all times up to May 15, 1998, thus the Partial Disability Definition applied to his claim:

    > [Y]ou are partially disabled if you are working in your own occupation but, as a result of Sickness, Injury or Pregnancy, you are unable to earn more than the Own Occupation Income Level. ND ¶ 3 Ex 2-265 (00580).

    Thus, a decrease in the Own Occupation Income Level is not sufficient to establish disability—the decrease must be caused by Sickness, Injury or Pregnancy. PlsRespDefsSepStmt, filed 01/22/01, ¶¶ 11,13.

- During the Policy's 90-day benefit waiting period (BWP) the claimant must be "**continuously** Disabled before LTD Benefits become payable [and] **[n]o LTD Benefits are payable** during the BWP." ND ¶ 3 Ex 2-250, 277 (00568A, 00592)(emphasis added). Because the Policy terminated as of March 1, 1997, DGM either met the requirements during the BWP, February 24 to May 25, 1997, or was not entitled to benefits.

- The administrative record reflects that DGM told Standard that as of August 4, 1997, more than five months after alleged disability, he had been working full-time. ND ¶ 2 Ex 1-235 (00489). Thus, even if DGM suffered an earnings decrease, it is

not the "result of . . . Injury", and DGM did not meet the partial disability definition of disability during the BWP.

• Standard advised DGM in writing that " . . . you indicated that you had been working full time right up to that point (August 1997)." ND ¶ 2 Ex 1-139 (00298). DGM did not before now claim that this statement was false or a fabrication.

• In Standard's November 13, 1997 letter, Standard advised DGM that his predisability earnings (PreDE) were "most likely $20,364.83" per month, 1/12 the sum of two 1996 W-2s that he had provided. ND ¶ 2 Ex 1-151, 177 (00324, 00422).

• As of November 13, 1997, Standard also did not have, but, prior to the end of the review process, did acquire, North Coast's record of salary paid to DGM between March 1, 1996 and February 28, 1997. He received an average of $17,118.00 per month, i.e., 1/12 of the annual total of $205,410.00. NOL-1 Ex AR 00166. This is **lower** than Standard's November 13, 1996 estimate of PreDE. Thus, the estimate was in DGM'S favor.

• At no time in the entire claim handling and review process, did Standard have DGM'S 1997 W-2s. Standard based its post-disability earnings (PostDE) determination on a document that DGM provided. The document stated that certain "Payments" totaling $210,238.02 were received in connection with DGM'S work. ND ¶ 2 Ex 1-152, 176 (00325, 00419). Standard totaled these for the listed months, March-August 1997, and calculated a monthly average of $26,183.32. This figure was a computational error in DGM'S favor, the actual average being $35,039.67. Either calculation, however, is **above (not less than 80% of)**, DGM'S PreDE, either as estimated by Standard ($20,364.83 per

month) or as reflected in North Coast's records ($17,118.00 per month). Further, DGM claims that his collections are delayed for at least 45 days and up to three months after billing. McR Decl, filed 01/22/01, ¶ 13. Thus, the "Payments" shown, which are higher for the months May - August 1997, reflect that DGM was working full time during the BWP, which had begun in late February 1997. ND ¶ 2 Ex 1-176 (00419).

- DGM disagreed with the use of the "Payments." He wrote that the Payments represented total collections on his receivables. He stated that "[a]fter our overhead is paid there is NOTHING left for the doctors." ND ¶ 2 Ex 1-146 (00311). DGM had told Standard that he was working full-time in August 1997. Standard did not credit his claim that he was working full-time but earning nothing and did not change its decision.

- On December 2, 1997, UNUM advised Standard that it had concluded that DGM suffered no loss of earnings prior to July 1997. ND ¶ 2 Ex 1-135 (00294). Without loss of earnings of at least 20% during the BWP (February 24-May 25, 1997), DGM was not entitled to benefits.

- Between 10% and 20% of DGM'S earnings and work activity cannot be captured by analyzing hospital surgical logs alone. ND ¶ 2 Ex 1-277 (00224). Further, DGM did not provide Standard with his surgical logs or any record of his activity at Mission Bay Hospital where he did 10% of his surgery.

DGM admits that on abuse of discretion review conflicting information or evidence that he presents does not create a factual issue, the sole question being whether Standard acted arbitrarily and capriciously. PlsMemOppDefMotSJ, filed January

22, 2001, 9:9-10:1, n. 5-6. Standard did not abuse its discretion or act arbitrarily or capriciously in (i) estimating PreDE at a figure that turned out to be higher than they were, (ii) recording DGM'S statement that he was working full time for months past the end of the BWP, or, (iii) determining that DGM was not working full time for nothing or simply to cover overhead and did not meet the partial disability definition during the BWP.

DGM insists his claim must be assessed on an alleged decrease in production, which, he says, is the same as earnings. Despite claiming that earnings and production are the same, the Policy refers to "earnings" not "production." His own expert and the very employment contracts he now introduces as evidence, do not support the assertion that "production = earnings." The North Coast contract provides that 25% of compensation is shared equally by all and thus not based on individual production. Pl NOL-3 Ex G-3. The McReynolds & Sedwitz (McR&S) contract and Mr. Vavoulis, DGM's expert, specifically refer to compensation based on "profitability" not just production. Pl NOL-3 Exs I-3, N at p. 2. As to records and his chart referring to number and duration of surgical procedures, DGM wrote that these ". . . are actually meaningless numbers [and] . . . really have nothing to do with one's level of work activity." ND ¶ 2 Ex 1-66 (00204).

B. <u>Standard wins if review is de novo.</u>

- DGM knew of the North Coast Policy, as he twice requested amendment of it (ND ¶ 3 Ex 2-253, 255 (00568D, 00570)). And, as an officer of North Coast, he was charged to know of it.

- The North Coast coverage terminated effective March 1, 1997, because North Coast did not pay premiums when due. DGM's statements that there was no termination notice are false. Endicott Decl ¶ 2 Ex 1-8, 10, 11. Further, DGM cannot claim that he is entitled to waiver of premium as of his alleged disability date of February 24, 1997. Even assuming the fact of disability, premium would have to have been paid through May 25, 1997, the end of the BWP, because waiver of premium is only applicable "*while LTD benefits are payable*" and "*[n]o LTD Benefits are payable during the BWP.*" ND ¶ 3 Ex 2-271, 277 (00586, 00592).

- In March 1992, Standard had sent North Coast 23 Summary Plan Descriptions (SPDs). Endicott Decl ¶ 2 Ex 1-14. One of the subsequent notices effecting a Policy change that DGM requested was to be attached to the SPDs and was sent directly to DGM in June 1995. Endicott Decl ¶ 2 Ex 1-15. The SPDs were received by North Coast, because they were given to an employee who later made a claim on the Policy and advised that s/he had received the SPD. 2dND ¶ 4 Ex 3-44. So, DGM had a copy of the SPD long before 1997, when he made his claim. DGM admits there is no variance between the SPD and the Policy. PlSepStmt ¶ 49. DGM always thus had and knew the Policy terms.

- The UNUM file and DGM's deposition testimony demolish his credibility. His claim that a Standard analyst fabricated his statement about full-time work is false—DGM made the same statements to UNUM. 2dND ¶ 2 Ex 1-13. DGM told UNUM that Mr. Gilmore was his "personal accountant" and available to help UNUM with disability issues (2dND ¶ 2 Ex 1-26), but tells this Court

that Standard's letter to Mr. Gilmore was misdirected. He is a multi-millionaire (2dND ¶ 3 Ex 2-32B (McR Dep I 90)). He decided to sell his house before Standard had considered his claim (2dND ¶ 2 Ex 1-16), not as he later stated, because of Standard's adverse claim decision (Pl NOL-1 Ex AR 00314). He misrepresented the facts when he stated that he did not work at all between February 25 and March 2, 1997. DefRespPlSepStmt, filed 01/22/01, ¶ 50. DGM did not tell Standard that 10% of his surgical procedures were performed at Mission Bay Hospital but told UNUM this and provided UNUM with records of this activity that were not provided to Standard. Case Decl ¶ 2; Sabo Decl ¶ 2; Selid Decl ¶ 3; 2$^{nd}$ND ¶ 2 Ex 1-17 to 23, 26 (01514, 01538-01543, 01742), ¶ 3 Ex 2-35, 39 (McR Dep II 54-55, 126:26-127:13). He did not tell Standard about his 12-hour, six times monthly post-disability trauma shifts and post-disability stipend income of $3,000.00 per month, but did tell UNUM about this work. Case Decl ¶ 3; Sabo Decl ¶ 3; Selid Decl ¶ 4; 2$^{nd}$ND ¶ 2 Ex. 1-26 (01742), ¶ 3 Ex 2-39 (McR Dep II 127:14-128:14).

- As shown on a 1997 W-2, DGM earned $170,000.00 between March 1, 1997, and December 31, 1997 from McR&S. Pl NOL-3 Ex K-1. Thus, his November 19, 1997 statement to Standard that he had no PostDE was false. Also false is the current testimony of Mr. Vavoulis (Vavoulis Decl, filed 01/22/01, ¶ 9) and DGM in his Opposition Declaration, filed 01/22/01, ¶ 32, that DGM'S 1997 W-2 from McR&S contains PreDE. DGM has stated:

> A new billing service was started on March 1, 1997 and there were no carry over charges, so any billing they have done is post disability production. **There is no contamination of pre and post disability production.** NOL-1 Ex AR STND/97 00059.

- His McR&S 1997 W-2 earnings create an average of $17,000.00 per month, 10 months, March-December 1997. An average of his 1997 W-2 income from McR&S is not appropriate, but, if it were, 80% of his PreDE as determined by Standard would be $16,291.86 (i.e., 80% of $20,364.83) and the $17,000.00 PostDE monthly average is greater than that.

- DGM worked only half time after July 1, 1997. McR Decl ¶ 28. Thus, far more of the $170,000.00 he earned from McR&S in 1997 must fairly be attributed to March through June 1997 than to half time efforts after July 1, 1997. Adjusting for the fact that far more of his work activity for McR&S occurred prior to July 1, 1997, DGM earned an average of $24,166.67 per month from March through June 1997. DefOppPlMotSA 7:23-8:26.

- DGM also alleges that his personal responsibility to pay off a McR&S loan reduces his 1997 W-2 earnings of $170,000.00 from McR&S. First, the Policy contains no provision that allows for credit against PostDE for business loan paybacks. Second, even were there such a credit, it would not be applicable to amounts earned at higher rates during the BWP and the month thereafter (March through June 1997), when DGM was **working full-time**. It would be applicable to months in which DGM worked less than full-time, but nevertheless got paid. Third, if 1997 W-2 earnings could be offset against loan paybacks, they would not have been reported as taxable income by DGM in 1997. DGM now claims, years after the fact, that "it is my understanding" that the 1997 and 1998 W-2s are being corrected. McR Opp Decl ¶ 36. This proves nothing. Fourth, neither DGM nor Mr. Vavoulis, an economist (not accountant), can competently explain the credit

for alleged loan paybacks. See Nelson Reply Decl (3dND) ¶ 3 Ex 2-14 (McR Dep II 100-101)(accountant would have to explain DGM's theory/no declaration from accountant on plaintiff's motion).

- DGM's arguments about offsets in his Opposition brief and Opposition Declaration, ¶¶ 46-64, are misguided. DGM sues to enforce a contract, not rescind it. If he obtains benefits, he must abide by the other terms of the Policy, and no authority to the contrary is cited. The Policy required him to seek all deductible income he might be eligible for. ND ¶ 3 Ex 2-269 (00584). He was thus required to apply for Social Security disability benefits. DGM is correct that worker's compensation benefits for **permanent** disability are not deductible income.

- Finally, the alleged changes in the provider productivity reports, based on the so-called "vascular lab" issue, that were received after close of the administrative record, are irrelevant, because the Policy measures partial disability by "earnings" not production. They concern DGM, because he recognizes that they demolish the case on the faulty production approach that he argues must be used to assess his claim. In any event, the altered reports are useless--DGM simply instructed an employee, who was not an accountant or a bookkeeper, to create new reports backing out the charges. 3dND ¶ 3 Ex 2-13, 16, 17 (McR Dep II 42-44, Romero Dep 19, 24-26).

In Tremain v. Bell Industries, Inc., 196 F.3d 970, 974, 977 (9th Cir 1999), the plaintiff's W-2s were relevant to a conflict claim on a partial disability definition issue. Here, since DGM alleges that his conflict claim reaches the merits, the W-2s and credibility evidence are also relevant to the merits. Standard

is entitled to present the foregoing evidence to rebut and has rebutted the conflict claim. Thus, review is for abuse of discretion. Standard has shown above that it did not act arbitrarily or capriciously. If review is de novo, the 1997 and 1998 W-2s and Standard's credibility evidence are "necessary." Mongeluzo v. Baxter Travenol, etc., 46 F.3d 938, 944 (9th Cir. 1994). This evidence does not go to a new claim-it shows that Standard made the right decision. This evidence was not available during the claim handling and review process. But DGM, by contrast with Standard, also seeks to introduce voluminous new evidence without specifying what is "necessary." Thus, even under de novo review, these submissions should not be considered. Kearny v. Standard Insurance Company, 175 F.3d 1084, 1091 (9th Cir. 1999). Plaintiff notes that on de novo review, he cannot get summary "adjudication" of his medical disability claim as the evidence is disputed. Kearny, 175 F.3d 1093-1094. Standard's summary judgment motion, however, does not rest on whether plaintiff is medically disabled, the issue identified in Kearny as preventing summary judgment. Standard has shown that, even if DGM suffered disability, he did not meet the partial disability definition within the BWP. Standard is entitled to summary judgment on de novo review.

Dated: January 29, 2001

*[signature]*
WARREN H. NELSON, JR.
A PROFESSIONAL CORPORATION
7400 El Cajon Boulevard
Suite 302
La Mesa, CA 91941-3417

Attorney for Defendant
STANDARD INSURANCE COMPANY

# DOCKET No. 99 CV 2705 IEG (JAH)

## PROOF OF SERVICE BY HAND

I, Eddie R. Chance, the undersigned, hereby certify and declare under penalty of perjury that I am over the age of 18 years and am not a party to this action. My business address is Warren H. Nelson, Jr., A Professional Corporation, 7400 El Cajon Blvd., Suite 302, La Mesa, CA 91941, telephone (619) 466-9400 and facsimile (619) 466-9402. On the **29th** day of **January 2001**, I served a true copy of the foregoing documents titled exactly:

DEFENDANT STANDARD INSURANCE COMPANY'S REPLY IN SUPPORT

OF ITS MOTION FOR SUMMARY JUDGMENT

by personally delivering it to the following offices of the following persons:

Glen M. Rasmussen, Esq.
7855 Ivanhoe Avenue
Suite 400
La Jolla, CA 92037

Thomas M. Monson, Esq.
Miller, Monson, et al.
501 W. Broadway,
Suite 700
San Diego, CA 92101

I declare under penalty of perjury that the foregoing is true and correct. Executed this **29TH** day of **January 2001** at San Diego, California.

*(signature)*
Eddie R. Chance